```
1                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MASSACHUSETTS
2

3                                           )
4    S.R.C.,                                )
     a minor child, by her next friends,    )
5    John Cobbett-Walden and Jennifer Lee   )
     Laurenza,                              )  Civil Action
6                                           )  No. 1:25-cv-12676-AK
            Plaintiffs,                      )  Pages 1 to 57
7                                           )
     v.                                     )
8                                           )
     STAVERNE MILLER, et al.,               )
9                                           )
            Defendants.                     )
10                                          )

11

12             BEFORE THE HONORABLE ANGEL KELLEY
                  UNITED STATES DISTRICT JUDGE
13

14                      MOTION HEARING

15

16                   September 30, 2025
                        2:29 p.m.
17

18        John J. Moakley United States Courthouse
                     Courtroom No. 8
19                  One Courthouse Way
                Boston, Massachusetts 02210
20

21

22             Linda Walsh, RPR, CRR
                Official Court Reporter
23        John J. Moakley United States Courthouse
                  One Courthouse Way
24            Boston, Massachusetts 02210
                 lwalshsteno@gmail.com
25
```

```
1    APPEARANCES:

2    On Behalf of the Plaintiffs:

3         CONN KAVANAUGH
          By: Kirsten Alexandria Zwicker, Esq.
4             Andrew R. Dennington, Esq.
          1 Federal Street, 15th Floor
5         Boston, Massachusetts 02110
          508-930-7161
6         kzwicker@connkavanaugh.com
          adennington@connkavanaugh.com

7

8    On Behalf of the Defendants:

9         OFFICE OF THE ATTORNEY GENERAL
          By: Timothy James Casey, Esq.
10            Katherine M. Fahey, Esq.
          One Ashburton Place
11        Boston, Massachusetts 02108
          617-963-2043
12        timothy.casey@mass.gov
          katherine.fahey@mass.gov

13

14

15

16

17

18

19

20

21

22                 Proceedings reported and produced
                    by computer-aided stenography.
23

24

25
```

P R O C E E D I N G S

THE CLERK:  Court calls Civil Action 25-12676, S.R.C. versus Miller, et al., will now be heard before this Court.

THE COURT:  Good afternoon.  Counsel, will you state your appearances for the record.  Let's start with counsel for plaintiff.

MS. ZWICKER:  Good afternoon, Your Honor.  Attorney Kirsten Zwicker on behalf of the plaintiffs.

MR. DENNINGTON:  And Andrew Dennington, also for the plaintiffs.

THE COURT:  Thank you.

And if any clients are present, you can introduce, but if not, all right.

And defendants.

MR. CASEY:  Good afternoon, Your Honor.  Tim Casey, Assistant Attorney General for the defendants.

MS. FAHEY:  Good afternoon, Your Honor.  Katherine Fahey, Assistant Attorney General for the defendants.

And we have counsel from DCF present.

THE COURT:  Okay.  And who is that?

MS. MARTIN:  Good afternoon, Your Honor.  Leslie Martin for the department, with the Department of Children and Families.

MS. MURPHY:  Monica Murphy, with the Department of Children and Families.

1          THE COURT:  All right.  Thank you.  Thank you for

2    coming.

3          MS. ZWICKER:  And Your Honor, if I may, on behalf of

4    the plaintiffs, you asked me to introduce my clients?

02:29  5          THE COURT:  I did.  I was curious about the silence.

6    Go ahead.

7          MS. ZWICKER:  My apologies.  On behalf of the minor

8    child, you have the foster parent John Cobbett-Walden, and also

9    on behalf of the foster child, Jennifer Lee Laurenza.

02:30  10          I apologize.

11          THE COURT:  Thank you very much for coming.

12          First order of business -- you can have a seat,

13    Counsel -- is I want to thank and acknowledge Mr. Lara.  He is

14    my courtroom deputy.  He's returned today.  Today is his first

02:30  15    day back from paternity leave, and as a result, I had someone

16    who was covering.

17          Attorney Casey, the Court owes you an apology.  I

18    believe that you were copied on an email that was

19    unprofessional, and it was -- demonstrates an error in

02:30  20    judgment, and I owe that to you.  All right?

21          MR. CASEY:  Thank you, Your Honor.

22          THE COURT:  All right.  Now, let's turn to -- oh, and

23    I should add -- why is this so loud, Mr. Lara?  Thank you.

24          I should add that that is being addressed.  And all

02:31  25    future communications should be with Mr. Lara.  Mr. Lara has

1   now returned.  And that's for everyone.

2          So we are here for a status conference.  There was a

3   complaint filed and a motion for a temporary restraining order

4   filed on behalf of the plaintiffs.  The Court issued an

02:31  5   emergency order because of what was indicated in that, that the

6   child in question was going to be -- was scheduled for a flight

7   later that week.  And a -- some filings have been received,

8   opposition as well as a motion for reconsideration of the

9   Court's order of the -- directing an appointment of a guardian

02:32 10   ad litem and opposition to that by the plaintiffs.

11          I believe that there is a pending motion for an

12   extension to -- let me just look it up -- to file a response or

13   reply to number 22, which is the emergency motion for a

14   temporary restraining order, and that will be granted.

02:32 15          We'll discuss when that should be done by, and -- so

16   the most pressing thing that took place was the scheduled

17   flight, and I understand and fully appreciate that the Court

18   entered an order for nothing to change, in essence, with

19   regards to the child's status until the Court could hear the

02:32 20   parties and deal with this.

21          And a number of questions that I have -- what I always

22   do is I allow plaintiffs to summarize, you know, set the table,

23   so to speak, with regards to the case, and then we can deal

24   with -- I guess the most important part is whether or not a GAL

02:33 25   should be appointed.  I do appreciate the motion for

1    reconsideration that was filed, and I'm wondering why I should

2    do that in light of what I've learned.

3           But Counsel, I'll -- whoever from plaintiffs' table.

4           MS. ZWICKER:  Thank you, Your Honor, on behalf of the

02:33  5    plaintiffs.

6           We have filed this 1983 action and brought these

7    federal questions before the Court to address what we believe

8    to be Fourteenth Amendment violations of the minor child in

9    this case and a violation of her due process rights coming out

02:33 10    of the Juvenile Court case.

11           And I want to be clear in the beginning of our

12    arguments, I see that the defendants in this case have argued a

13    great deal in their filings, the *Younger* abstention and the

14    *Rooker-Feldman* doctrine, indicating that we shouldn't be here

02:34 15    before the Court, that we are seeking to disturb the Juvenile

16    Court's ruling with respect to custody.  That is not the case,

17    Your Honor.  We have no interest in disturbing the Juvenile

18    Court's ruling.  And if the biological father were here and

19    could depart with his daughter on a flight, then he would be

02:34 20    welcome to do so, and we would have no standing to come before

21    the Court with these questions.

22           But those are not the intended circumstances here, and

23    there was a juvenile proceeding that occurred without a trial

24    on the merits and a juvenile proceeding that occurred without

02:34 25    the appointment of a GAL, and we believe that our client's due

1    process rights were violated.

2            THE COURT:  Let me just jump in --

3            MS. ZWICKER:  Please.

4            THE COURT:  -- because it helps me with my

02:34  5    comprehension to ask questions as they arise.  You said that

6    with -- a trial didn't happen, and the other part was that no

7    GAL was appointed.  Is that typical for that type of

8    proceeding?

9            MS. ZWICKER:  A guardian ad litem not being appointed,

02:34 10    I would suggest, is not typical.  A trial at times can be

11    avoided if the parties come to an agreement --

12            THE COURT REPORTER:  I'm sorry.  If you could just

13    slow down just a little bit.

14            MS. ZWICKER:  Oh, absolutely.

02:35 15            THE COURT:  I've given her complete permission to

16    interrupt when that happens.

17            MS. ZWICKER:  I apologize.  That's not the first time,

18    I'm sure, you'll have to yell at me about that.

19            So I would start off with saying, it is not typical

02:35 20    that a guardian ad litem, particularly when requested by

21    counsel for the child, is avoided in a matter such as these,

22    Judge.  That would not be a typical outcome.

23            THE COURT:  So one was asked and one was never

24    appointed?

02:35 25            MS. ZWICKER:  Correct.  The request was made and

1    denied by the Court.  The scheduling of a trial, I would say,

2    is also not typical.  The scheduling of a trial and then

3    leading up to a very short time frame, I think it was about a

4    week beforehand, that trial date was then taken off in favor of

02:35 5   the judge's findings which we were able to receive after filing

6    an emergency motion with the Juvenile Court in this case.  So

7    yes, I would suggest --

8           THE COURT:  Counsel, hang on one second.  With regards

9    to the filings, does anyone have printed copies for the Court?

02:35 10  No?  No?  You have a lot of exhibits.

11          MS. FAHEY:  I have extra papers, but they are double

12   sided, Your Honor.

13          THE COURT:  I like double sided.  It saves on paper.

14   So I have not had the opportunity to do that.  I just got

02:36 15  access to those sealed items in particular.

16          MS. FAHEY:  I'm happy to hand up my copy.

17          THE COURT:  Thank you.  Go ahead, Counsel.  You may

18   continue.

19          MS. ZWICKER:  Thank you, Judge.

02:36 20         So the federal questions that we're bringing before

21   1983 deal with those two violations, and one of the things

22   that's swirling around, and I noticed in both parties'

23   pleadings, there's an indication in defendants' pleadings

24   repeatedly throughout that this was the child's desire, that

02:36 25  she was adequately represented at this underlying hearing, and

1    it was communicated through her counsel that this was her

2    desire to reunify with her father.

3           And two things I would point out, they keep using the

4    word "reunification."  Well, I would suggest, one cannot

02:36  5  reunify with someone that they've never been with.  And there's

6    also indication that they're returning custody of this child to

7    the biological father.  This father has never had either

8    physical or legal custody, and I think those terms of art are

9    important.  There is discussion in the filings relevant to

02:36 10  Perkins --

11          THE COURT:  So I noticed you jumped right into

12   argument rather than setting the table.

13          MS. ZWICKER:  Yes.  I apologize.  I will circle back,

14   Judge.  I'll bring it back.

02:37 15         So this is why we think it is paramount that the Court

16   do proceed with the appointment of a guardian ad litem.  One of

17   the issues that counsel raises is whether or not my clients are

18   properly situated to be next friend to the minor child.  I

19   certainly recognize, and I imagine that we all do, that there's

02:37 20  a very wide berth for an individual to be appointed as next

21   friend.  I think that both the foster parents -- foster parent

22   and the close neighbor and family friend are rightfully

23   situated.

24          I imagine counsel is going to argue that there's a

02:37 25  conflict there because they wish to adopt the child.  I think

02:37    that all just leads all the more to the notion that a GAL must
2    proceed in this case, and I would suggest that the GAL's
3    appointment mission is to determine whether this child wants to
4    leave the United States, the citizen wants to leave the United
02:37 5    States indefinitely and relocate to Guatemala to live with her
6    biological father.  And I think that the facts and
7    circumstances of our pleadings flesh out that that is a very
8    large question.  It would be the goal of the plaintiffs in this
9    case --

02:37 10    THE COURT:  But did the court and -- the Juvenile
11    Court make that finding?

12    MS. ZWICKER:  Interesting that you ask that.  In the
13    eight-page finding of Judge Phelan-Brown from the Juvenile
14    Court, she never lists that it was the expressed wish of the
02:38 15    child to reunify or relocate or be with her father.

16    THE COURT:  So it comes from where?

17    MS. ZWICKER:  Well, the ultimate order from the court
18    was that father would be awarded custody, and then the DCF
19    would put together a travel plan.  And DCF's travel plan is
02:38 20    either a DCF counselor member, or there is a third party in the
21    mix who was hired by the biological father, that would then
22    escort the child back to Guatemala.

23    And our concern here, Judge, is there is no authority
24    that a state agency would have the legal right to take a U.S.
02:38 25    citizen and expel them from the country for an indefinite

period of time.  It's a very different case if they were going

with a parent.

So it would be our goal here, in finishing up setting

the table, to have a permanent injunction in place that would

refrain DCF from doing that.  There are other legal measures, I

am sure, the biological father could do with the Department of

Immigration to secure his right to come back here and take

custody of his child.  But to have a state agency facilitate

this action in this manner, we suggest, is well out of their

wheelhouse.

THE COURT:  I'm trying -- so because these documents

were filed under seal and our court system has undergone a

change just recently, I don't have easy access to them, so I

appreciate the copies, but to the extent that you're referring

to anything -- and I'm going to see if I can get it

electronically on my computer, and Mr. Lara may have to come up

to the bench to assist me with that.  I do see that what I've

been handed does not have the header of the Court's page

numbering on it.  So it may be a little bit difficult for me to

find the particular pages that parties might want to direct my

attention to.

But turning to the last point that we were talking

about -- let's see.  Wait a second.  Give me one second.

All right.  With the assistance of -- it looks like

it's about 85 pages.  Mr. Lara, I have it.

```
 1              THE CLERK:  Okay.

 2              MS. ZWICKER:  It would be Exhibit E to the defendants'

 3    attachments, Exhibit E.

 4              THE COURT:  Let me find that.  Any idea what page that

 5    is because I have it electronically up that has the court

 6    header on there with the page numbers.  I see Exhibit B.

 7              MS. FAHEY:  It should be page 81 of the PDF, Your

 8    Honor.

 9              THE COURT:  Thank you.  Okay.  I'm at page 81.  It

10    looks like it's the conclusion of something.

11              MS. ZWICKER:  It should be the permanent custody

12    order --

13              THE COURT:  It's Attorney Tina Aronis; is that the

14    proper page I should be looking at?

15              MS. ZWICKER:  What you should be looking at is the

16    permanent custody order and return of custody that was signed

17    by Judge Phelan-Brown.

18              THE COURT:  I have got to find that.  That was not G,

19    F.  So what page of that?  I now have Exhibit E.

20              MS. FAHEY:  Your Honor, in the document I handed you,

21    it's page 82.  If the Court has separately stamped the pages,

22    they would be off slightly.

23              THE COURT:  So it's 71 on the Court's system.  You

24    said page 82.  There's no numbers that go that high.

25    Everything has its own individual number.  All right.  So where
```

02:40 (line 5)
02:41 (line 10)
02:41 (line 15)
02:41 (line 20)
02:42 (line 25)

1    am I looking?  It has -- page 77 has D through H.  There are

2    some numbered paragraphs and the order.

3              MS. ZWICKER:  You're going to look at page, Your

4    Honor, 6 through 8 --

02:42 5              THE COURT:  Okay.  I'm there.

6              MS. ZWICKER:  -- of the order.  And page 7 starts the

7    order of the immediate transition plan.  But again, what's

8    inherent throughout this eight-page order is there are no

9    findings by Judge Phelan-Brown relative to the child indicating

02:42 10   that it was the child's expressed wish.  The closest you get to

11   anything is on page 6 where the judge finds that there's clear

12   and convincing evidence to demonstrate that father is fit and

13   that that notion is joined by counsel for the child and father.

14   So fitness was certainly fleshed out in this document but the

02:43 15   child's expressed wishes were not.  And there was no motion

16   filed by counsel during the proceedings with a supporting

17   affidavit indicating the child's wishes.

18             THE COURT:  Let me just read this.

19             So this -- in reading paragraph 9, the immediate

02:43 20   transition plan, and A through H, the Court states that

21   permanent custody is to be transferred to the father, right?

22             Let me just find the temporary custody written plan.

23   Custody will transfer to the father as soon as physically

24   reunited with him, presumably at the airport, and temporary

02:44 25   custody shall lapse with DCF.

1          All right.  So I guess what I'm trying to figure out

2     is why should I interfere with this when another court has

3     already dealt with it?

4          MS. ZWICKER:  We're not asking the Court to interfere

02:44 5     where there's the issue of the custodial findings, Judge.  What

6     we're asking the Court to look at is, again, our client's

7     rights under the Fourteenth Amendment and the due process

8     rights.  There's no finding that you'll see here that the

9     child's expressed wishes were even considered or made part of

02:45 10    the findings.  And there's nowhere that I've seen, at least

11    defendant has pointed to -- and I don't want to get into the

12    argument yet of our impending hearing -- that there was any

13    authority.  And the concern here is that the immigration rights

14    of citizens/noncitizens is something held strictly under

02:45 15    federal authority, not state authority.

16          And if you look at the lineage of cases that deal with

17    this issue and the argument that has come and failed about de

18    facto deportation, the end game has always been, well, the

19    government isn't expelling these children citizens.  They are

02:45 20    accompanying their parents who no longer have the ability to be

21    here.  That is not what is taking place here.  This man doesn't

22    even have custody.  He's never been a parent to this child.

23    He's had visitation over time.  And this is the government.

24    This is a state agency under the color of their authority

02:45 25    packing up a United States citizen and shipping them off

1    indefinitely to a foreign country after no trial, no guardian

2    ad litem, and no finding from the Court indicating that the

3    child's wants, desires were even considered.

4        THE COURT:  So is this a matter for the Juvenile Court

02:46  5    under a motion for reconsideration, an appeal, or something

6    else?

7        MS. ZWICKER:  No.  I believe it's a federal question

8    for this Court because they are seeking to expel her from the

9    country.  If they were going to move her to New Hampshire or

02:46 10    Vermont or something like that, but they're seeking to expel

11    her from the country.  And it is that coupled with the facts

12    and circumstances that we discussed that makes it a federal

13    question rightly before this Court under 1983.

14        Again, we're not looking to disturb the custodial

02:46 15    finding.

16        THE COURT:  September 8th, 2025, so there's still time

17    to appeal this.  Okay.  So tell me, what's the GAL going to do?

18        MS. ZWICKER:  A GAL -- well, twofold.  Because we have

19    this action filed and obviously an argument from the defendants

02:46 20    here would be the best course of action, as the Court has

21    already determined and put in their order of September 19th,

22    the guardian ad litem will protect the child's interests in

23    this federal question, and certainly flesh out the imminent

24    question was whether or not this child expressly wishes to be

02:47 25    removed from the United States, relocated to Guatemala, and

```
 1   live with her biological father.
 2         And I will add to this, Judge, the argument, again
 3   replete throughout their filings, is that she wishes to do
 4   that, that she has a fulsome understanding of that.  I will
 5   tell you that she refers to my clients, her foster parents, as
 6   mommy and daddy repeatedly.  And there is discussion, and I
 7   will point out in one of the defendants' filings, when they
 8   indicate that it is an expressed wish of this child, they point
 9   to a lengthy affidavit filed by a department head with DCF, and
10   she indicates that through counsel that she -- this is the
11   minor child -- was looking forward to going to Guatemala and
12   very excited to meet her brother.  During a visit on August
13   29th, she also told the social worker --
14         THE COURT:  Help me with what you are reading from so
15   I can read along with you and find it later.
16         MS. ZWICKER:  Absolutely, Judge.  This is the
17   affidavit of Yasmin Pereyra.
18         THE COURT:  Okay.  I have it.
19         MS. ZWICKER:  This was filed and accompanied with the
20   defendants' opposition to our motion, and it's paragraph 37.
21         THE COURT:  Thank you.  Give me one second.  Page 37
22   appears on page 8 of 13, okay?
23         MS. ZWICKER:  Correct.  And here this is the proffer
24   that they make for the contention that the child expressly
25   wishes to relocate to Guatemala, and in this point the DCF
```

worker offers that she, meaning the minor child, was looking

forward to going and very excited to meet her brother.  During

a visit on August 29th, she also told the social worker that

she was excited to see her family in Guatemala.  That sounds

like somebody talking about a vacation, Judge, not permanently

removing themselves from this country from foster parents, from

people that she refers to as mommy and daddy, and has a clear

understanding that she's not coming back any time soon.

Certainly I appreciate that she retains her right to

be a U.S. citizen, and when she reaches the age of majority,

she can return.  But we're talking about now a state agency

expelling her now, removing her now.  Under what authority can

they do that?  That is the question that we have for the Court,

why we think we are properly placed to have this examination

done and have a permanent injunction in place until such time

that we can have a hearing on the merits.

THE COURT:  Okay.  Counsel, I'll give you the

opportunity, but one of the things that I want to know is

whether or not the agency will agree not to attempt to move the

child until this is resolved.

MR. CASEY:  We will.  Until this Court rules on the

preliminary injunction motion, Your Honor, we will not put the

child on a flight to Guatemala.

THE COURT:  All right.  Thank you very much.

MR. CASEY:  Your Honor, I think, if I could, I

recognize -- even though we are prepared to argue the merits of
the case and the preliminary injunction motion today, that was
the procedure we would have preferred and asked for, but we
recognize that this is a status conference.  And so I'll -- I
won't get into the merits right now, but I do want to set the
stage as you asked --

        THE COURT:  Thank you.

        MR. CASEY:  -- to address the GAL issue.  This case
stems from what's called a care and protection case, a child
custody case in the Juvenile Court, which has exclusive
jurisdiction in Massachusetts over such cases.  It started
September of 2021.  It's been going on for over four years now.
The child has been represented by counsel at all times.

        THE COURT:  And the child is eight now?

        MR. CASEY:  The child is eight, correct.

        THE COURT:  Okay.  Go ahead.

        MR. CASEY:  The job of the attorney for the child, and
this is very well established in Massachusetts through our
Committee for Public Counsel Services, is to zealously advocate
for the interests of the child on the child's behalf.  At first
the case was about neglect by the biological mother.  The
father was in Guatemala at the time.  When he learned that the
child was in DCF custody, he came to the United States, even
though he was not a United States citizen, made contact with
the Department, and began taking steps to demonstrate that he

1    could be a fit parent.

2        In September of 2024, the Department, in recognition

3    of the significant efforts that the biological father had made,

4    which included attending visits regularly, taking ESL classes

02:51 5    to learn English, attending the child's medical appointments,

6    taking a parenting class, taking a number of other steps.

7        Slowly over time the Department changed the goal for

8    the child from adoption to reunification with the biological

9    father.  You will see in the -- in addition to the protections

02:51 10   of a lawyer who represents the child's interests zealously,

11   there are many other protections in the Juvenile Court,

12   including a court investigator, who is appointed by the judge

13   to investigate the facts and circumstances of the family and

14   make a report to the Court about the disposition of the case.

02:52 15   That report was submitted, and you'll see it in the Pereyra

16   affidavit.  I'm forgetting the exhibit number but -- Exhibit A,

17   which the Court investigation report recommends that the child

18   be reunified, reunited with the biological father.

19        DCF continued in these months to take steps to carry

02:52 20   out that goal because parents have a constitutional right to

21   the custody of their children in the absence of clear and

22   convincing evidence of parental unfitness.  That's from the

23   Supreme Court's decision in *Santosky against Kramer*,

24   longstanding rule of substantive due process, substantive due

02:52 25   process of the biological parents' rights to the custody of

1    their children.

2         THE COURT:  With regards to this report, the

3    updated -- oh, I see the date up there.  February 23rd, 2025.

4         MR. CASEY:  Correct.

02:53  5         THE COURT:  All right.  Go ahead.

6         MR. CASEY:  And so DCF was carrying out its obligation

7    to reunify the child with the biological father consistent with

8    the father's constitutional rights to the custody of his child.

9    That process continued.  In August of this year the Department

02:53 10   filed a motion.  There was originally going to be what's called

11   a review and redetermination hearing in September.  That is an

12   opportunity when a parent has been previously deemed unfit, and

13   earlier in the case, long before the father had taken steps to

14   demonstrate his fitness, he stipulated to unfitness but

02:53 15   reserved the right to seek review and redetermination, to say

16   give me a chance, give me time to take steps to demonstrate my

17   fitness.

18         And so he asked for a re-review and redetermination

19   hearing, which, as long as parental rights have not been

02:54 20   terminated, a parent has a right to request review and

21   redetermination every six months.

22         THE COURT:  And that's what was supposed to happen?

23         MR. CASEY:  That was what was supposed to happen in

24   September, but what happened in August is the Department, as it

02:54 25   is supposed to, as it is legally required to, came to the

1    conclusion that there was -- not only was there not clear and

2    convincing evidence of unfitness but the parent -- but the

3    biological father had actually demonstrated his fitness to have

4    custody.

02:54  5          So the department filed a motion supported by -- one

6    thing I forgot to mention, there was an international home

7    study carried out by a third-party agency -- you'll see that in

8    the exhibits as well -- which extensively and exhaustively

9    studied the father's home in Guatemala and demonstrated all the

02:54 10   ways in which it is a safe and comfortable and loving home and

11   recommended that the child live with father there.

12         THE COURT:  And did this home study confirm what this

13   video that -- I had a chance to review some things, scan the

14   documents -- that he sort of did a home video showing someone

02:55 15   here in the States what his home looked like, so did that

16   international home study confirm all of those things, and it

17   wasn't just somebody else's house?

18         MR. CASEY:  Not only -- no.  The workers for the

19   third-party agency went to Guatemala.  They actually went to

02:55 20   his house and examined the living arrangements, talked to him,

21   talked to his partner, saw the house, saw the living

22   arrangements, and said they were safe, clean, appropriate, and

23   that it was appropriate for the child to live there.

24         THE COURT:  Okay.  Go ahead.

02:55 25         MR. CASEY:  So in August the Department moved to

1    return custody of the child to father.  This is --

2              THE COURT:  Give custody because --

3              MR. CASEY:  Yes.

4              THE COURT:  Give physical custody.

02:56  5              MR. CASEY:  Not legal custody because once -- just --

6    I'm sorry.  It may sound like splitting hairs, but it's

7    important.  When the Department takes legal custody as part of

8    a care and protection proceeding, which they did here in

9    September of 2021, they have legal custody of the child, which

02:56 10    includes the right and the responsibility to select the right

11    placement for the child, which at some point became the foster

12    parents' home, but legal custody remains with DCF until it is

13    returned or given to the biological parent or parental rights

14    are terminated.

02:56 15              So here the Department asked the Court to give

16    custody, legal custody to the father because father was now

17    fit.  Again, not only did DCF not have clear and convincing

18    evidence of unfitness, but in fact, had concluded that the

19    father was fit, and so asked the judge to order that custody be

02:57 20    transferred from DCF to the biological father.

21              The Juvenile Court held an evidentiary hearing on that

22    motion.  A worker from DCF was allowed to testify.  Foster

23    father was also allowed to testify and to express his views and

24    his preferences regarding where the child should live.  After

02:57 25    considering that testimony --

|  |  |
|--|--|
| 1 | THE COURT:  And what is this called, like a fitness |
| 2 | hearing? |
| 3 | MR. CASEY:  It's technically a motion hearing, Your |
| 4 | Honor, but it was evidentiary because the judge heard from live |
| 02:57 5 | witnesses and received evidence.  There was cross-examination. |
| 6 | So it was a motion hearing but it was an evidentiary motion |
| 7 | hearing. |
| 8 | THE COURT:  Okay. |
| 9 | MR. CASEY:  And at the end of that hearing, the court |
| 02:58 10 | concluded that father was fit, and consistent with his |
| 11 | Constitutional rights ordered that custody be given to the |
| 12 | biological father. |
| 13 | THE COURT:  Now, is that Exhibit E that we -- |
| 14 | MR. CASEY:  Correct.  That is the order of the Court |
| 02:58 15 | with accompanying findings demonstrating reaching the Court's |
| 16 | conclusion that father is fit and that custody should therefore |
| 17 | be given -- should be changed from DCF to biological father. |
| 18 | THE COURT:  So what is Exhibits C and D? |
| 19 | C looks like it's a letter.  It's just sort of a cover |
| 02:58 20 | sheet.  And D? |
| 21 | MR. CASEY:  One, Your Honor, is an affidavit of the |
| 22 | social worker that was submitted in support at the motion to |
| 23 | return hearing that was submitted -- |
| 24 | THE COURT:  What is?  You said one. |
| 02:59 25 | MR. CASEY:  Exhibit C -- oh, D.  I'm sorry.  So that |

          1    should be an affidavit.

          2         THE COURT:  Yes, okay.  Leslie Santos.

          3         MR. CASEY:  Exhibit C is DCF's motion to return

          4    custody to the father.

02:59     5         THE COURT:  All right.  Go ahead.  Thank you.

          6         MR. CASEY:  So the court, after conducting this

          7    hearing, hearing testimony, receiving the exhibits and

          8    considering them, issued what you have as Exhibit E to the

          9    Pereyra affidavit, which orders DCF to return custody, and it

02:59    10    says it several times, to do so promptly.

         11         It says DCF shall come up with an immediate plan to

         12    transition the child to father's custody, and it shall arrange

         13    for a flight to Guatemala, quote, as soon as available.  So

         14    everything that forms the basis for plaintiffs' lawsuit here is

03:00    15    DCF's efforts to comply with the Court's order.

         16         THE COURT:  What is Exhibit F?  It looks like an

         17    emergency abuse of discretion motion to remove child from

         18    foster home.

         19         MR. CASEY:  Your Honor, that is a motion by the

03:00    20    biological father, who is a party to the care and protection

         21    case.  This goes back to this issue of legal custody.  When DCF

         22    has legal custody, it has discretion to determine the

         23    appropriate placement for a child.  If a party believes that

         24    the child's current placement abuses DCF's discretion, then

03:00    25    they can file a motion asking the Court to override DCF's

1    placement decision, and so biological father filed a motion

2    which he later withdrew.

3         THE COURT:  So this September 16th it was filed but

4    later withdrawn?

03:00  5         MR. CASEY:  Correct.  So father argued that DCF had

6    abused its discretion by keeping the child with the foster

7    parents but later withdrew that motion.

8         THE COURT:  And did he withdraw it once the flight

9    plans were made; is that the reason for the withdrawal?

03:01 10         MR. CASEY:  Once the motion to return was granted,

11    Your Honor.  I don't know how it relates to the flight, but

12    definitely after the Juvenile Court granted the Department's

13    motion to return.

14         THE COURT:  So it looks like Judge Katherine

03:01 15    Phelan-Brown issued her order in September 8th of 2025, and

16    then that motion by the biological father, September 16th,

17    2025.

18         MR. CASEY:  Okay.  So I apologize.  I may have the

19    exact timeline incorrect, but it may have been only once he --

03:01 20    once a flight was --

21         THE COURT:  Do we know when it was withdrawn?

22         MS. FAHEY:  Your Honor, it's in paragraph 50 of the

23    Pereyra affidavit.  On September 17th counsel for father

24    withdrew the motion after a lobby conference when the flight

03:02 25    was set, reservations were shared.

1      THE COURT:  So that makes sense.  All right.  Thank

2  you for helping me understand what I have here.  You may

3  continue.

4      MR. CASEY:  So, Your Honor, this is, as you know, this

03:02  5  is --

6      THE COURT:  I may not, so go for it.

7      MR. CASEY:  Well, our argument is that everything that

8  can be decided has been decided by the Juvenile Court.

9      THE COURT:  What's the plaintiffs' recourse?  Is it to

03:02 10  go back to the Juvenile Court and -- or appeal these orders?

11      MR. CASEY:  Your Honor, foster parents are not

12  typically parties to a care and protection proceeding.  Their

13  rights -- and this is recognized in a Supreme Court case called

14  *Smith* --

03:02 15      THE COURT:  Makes sense.

16      MR. CASEY:  -- that says while biological parents have

17  a fundamental constitutional right to custody, foster parents'

18  rights, while important, are generally set by state law and

19  contract, which is exactly how it is in Massachusetts.

03:03 20  Massachusetts has regulations that govern the requirements for

21  foster parents.  There's also typically a foster parent

22  agreement.  The regulations for DCF -- and we cite these in our

23  preliminary injunction opposition -- but they expressly require

24  foster parents to support the relationship between the child

03:03 25  and the biological parent and to support where appropriate

1    reunification between the child and the biological parent.

2         So those are -- those are the understandings and the

3    expectations and the requirements of foster parents in these

4    proceedings.  Their views are always heard.  They're entitled

03:03  5    to be heard in a trial or an evidentiary hearing like this.

6    The foster parents often testify, as the foster father did

7    here.  He was entitled and permitted to make his views heard.

8    But after the judge issued the decision, they are -- because

9    they are not a party, they would not have appellate rights.

03:04  10         THE COURT:  And the parties in that litigation would

11    be the father, DCF --

12         MR. CASEY:  As the petitioner, the child, and the

13    biological father.

14         THE COURT:  And everyone was represented?

03:04  15         MR. CASEY:  Everyone was represented.  And everyone

16    supported the motion to return to custody, including counsel --

17    again, counsel for child, whose job is to zealously represent

18    the interests of the child, supported the motion to return, and

19    as Ms. Zwicker pointed out, relayed -- this is in paragraph 37

03:04  20    of the Pereyra affidavit -- relayed that the child was excited

21    to be with her family in Guatemala, was excited to see them and

22    to be with them.

23         Now, Ms. Zwicker argues today that this isn't a

24    challenge to the Juvenile Court proceeding.  It's simply a

03:05  25    challenge to the fact that DCF is the party moving the child

from Massachusetts to Guatemala because the biological parent

is a noncitizen who has been deported.  That argument is

respectfully quite disingenuous, Your Honor.  The biological

father cannot enter the country.

03:05    And when DCF concludes or the Court concludes for DCF

that a parent is fit and that custody has to be returned from

DCF to the parent, DCF has an obligation, regardless of whether

the child lives in Massachusetts or another state or another

country, to return custody of the child as soon as possible to

03:05    the biological parent.  And that is all that is happening here.

DCF is complying with the Juvenile Court order to return

custody to the biological father.

THE COURT:  And that Court knew that he had been

deported and is no longer here?

03:06    MR. CASEY:  Yes.

THE COURT:  Now --

MR. CASEY:  Your Honor, if I could, I just want to

mention one case.  This is from the intermediate appellate

court, but there is a recognition that in cases involving

03:06    noncitizen parents, and even in that case a parent who had been

deported, working with biological parents can present, quote,

special challenges, but it does not eliminate DCF's obligation

to work with families, and if appropriate, to reunify families.

THE COURT:  All right.  And I don't know if this is

03:06    possible, but maybe you had this experience before, for the

01   father to travel to the U.S. to stay but not to enter the U.S.

02   through the Customs and Border entry point, but for the child

03   to be taken into that secure area, meaning beyond TSA, and

04   connected with the father at the airport to return with the

03:07   05   father.  Because that sort of eliminates the issue with regards

06   to father not being here to take the child in accordance with

07   the Juvenile Court's order.

08          MR. CASEY:  Your Honor, if I understand your question

09   correctly, is it, could father come to the country to a place

03:07   10   where he would be allowed to stay briefly until --

11          THE COURT:  At the airport.

12          MR. CASEY:  At the airport.  Your Honor, I don't know

13   the answer to that question from an immigration law

14   perspective.  I assume that would carry extreme risk of the

03:07   15   father being detained and again deported.  I think that that

16   would be taking extreme risk that could frankly jeopardize

17   father's availability to take custody of the child.

18          Instead, all that's happening, all that's happening

19   is, again, if it's necessary for DCF to make arrangements to

03:08   20   drive a child to New Hampshire, if it's necessary to make

21   arrangements to drive them to Springfield, if it's necessary

22   for them to make arrangements to go to another country, that's

23   what DCF does to comply with the court order and to reunify a

24   child with their biological --

03:08   25          THE COURT:  Taking the child to Guatemala or just

putting the child on the plane?

MR. CASEY:  No.  They are going to accompany -- DCF is going to accompany the child on the flight to Guatemala, and they are going to stay with the child until she is physically in the custody of the biological father.  I think -- I don't know if the court order specifies this, but they're actually going to take pictures and present those to the Juvenile Court to confirm that the child has been reunited with the biological father in Guatemala.  But DCF will accompany the child on the flight to Guatemala.

THE COURT:  Okay.  I know we have -- I have not given you an opportunity yet to touch on the GAL issue, but let me just give counsel an opportunity to respond, add anything additional to the factual outline.

MS. ZWICKER:  You know, I understand the defendants' posture here wants to be like, we're just giving her a ride, essentially, right?  This is an order.  We're trying to facilitate it.  We're doing the best that we can do.

It's one thing to take somebody to the state of New Hampshire or take them out to Kentucky.  They are in the continental United States.  They enjoy all the rights and privileges of a citizen.  But to take someone, to have the state be the one facilitating -- and I suggest the state has no inherent authority to do so, otherwise we would have heard it by counsel.  To have the state take a U.S. citizen and board

1      with them on an international flight --

2              THE COURT:  But you told me the father can do that,

3      right?

4              MS. ZWICKER:  The father can.

03:09 5          THE COURT:  If the father was here, the father could

6      take the child on this flight.

7              MS. ZWICKER:  100 percent.

8              But I think the state advocating for that,

9      facilitating that is a distinction with a huge difference in

03:10 10     which is another piece of our argument why we say her due

11     process rights were violated here.  This is going to a country

12     that she doesn't speak the language.

13             THE COURT:  I understand.

14             MS. ZWICKER:  The father doesn't speak English.  This

03:10 15     is not a parent of hers of many years that came to lose custody

16     through the DCF process and now they're being united.  This is

17     a man she does not know to any great extent, Judge.  All those

18     circumstances to have DCF facilitating it, when they are under

19     no color of particular authority that they can cite to do that,

03:10 20     is disconcerting.  I think the issue certainly of what's going

21     on here is larger than this particular case.

22             And while we're talking about the issue of --

23             THE COURT:  What is that larger issue?  I like big

24     pictures.

03:10 25         MS. ZWICKER:  This is a constant practice of DCF, and

1    I'm hearing from counsel that this is the case, that if there's

2    no parents around here and they're in Guatemala, Nigeria, we're

3    going to book a flight and take them over there.  That is very

4    disconcerting that state agencies are now dipping their toe

03:10  5    into the territory of naturalization of our citizens.  That is

6    not their job.  That is not their role.  That is the federal

7    government's role.  And it's not just simply complying with a

8    state court order.

9         And I notice that Judge Phelan-Brown's order is a

03:11  10    little light in that regard.  She orders the immediate travel

11    plan and flight itineraries, but she doesn't really say that

12    DCF is authorized to book a flight and take her

13    internationally.  She doesn't go that far with it, and I find

14    that interesting and curious.

03:11  15         And I'm also hearing about zealous advocacy --

16         THE COURT:  But can't they, DCF, since your clients

17    can't, but can't DCF then seek clarification or modification of

18    that Court's order to address that, if you think that that's

19    the gap?

03:11  20         MS. ZWICKER:  Well, I don't think that's the gap.  I

21    think there's a question of lack of authority for either a

22    state judge to make that order to a state agency to then travel

23    internationally in order to convey custody, that I think is

24    where the rub lies.

03:11  25         And I hear from counsel today -- you asked a very good

1    question -- is there another way we could do this.  Because I

2    appreciate at the end of the day, we're not arguing that this

3    man shouldn't have custody, we're arguing about the

4    facilitation of it and the process that was undertaken for our

03:12  5    client, the minor child, whether her rights were protected.

6         And I hear about the zealous advocacy of the attorney

7    appointed in the DCF proceeding, the C and P proceeding.  My

8    clients took custody of the child in February of 2022 as part

9    of the foster care plan.  They never saw anything from Attorney

03:12 10   Bertram until December.

11         THE COURT:  Attorney?

12         MS. ZWICKER:  Stephanie Bertram, who was the attorney

13   appointed for the child in the C and P action.  They never saw

14   hide nor hair of her until December of 2023.  You would hear

03:12 15   from my clients that she offered to Mr. Cobbett-Walden at the

16   August 18th of this year -- August 18th, 2025 hearing, that she

17   didn't know what the minor child wanted and she was exercising

18   substituted judgment.

19         My colleague went to court last week to get Juvenile

03:12 20   Court records because we needed them for this proceeding, and

21   apparently Attorney Bertram testified or made reference on the

22   record there that this is what the child expressly wanted.  So

23   there's a very large gap here, which is why we are before this

24   Court with these federal questions, but they certainly are

03:13 25   federal questions.  So I don't --

         1              THE COURT:  So in -- I think you said in 2022 and

         2    2023.

         3              MS. ZWICKER:  Right.

         4              THE COURT:  That would be two to three years ago, and

03:13    5    the child would have been five and six years old, right?

         6              MS. ZWICKER:  Yes.  Well, the comment regarding

         7    substitute judgment was just two months ago, a month and a half

         8    ago.  I'm indicating the gap.  Though she had been appointed

         9    counsel, counsel didn't see the child for almost a year and a

03:13   10    half during the course of this case.  I know this is reliant on

        11    zealous advocacy and that counsel would be involved in seeing

        12    the child, but I want to point out in contravention to my

        13    brother's argument here that this attorney that was represented

        14    went a year and a half without seeing the child and only did so

03:13   15    at the behest of the foster parents, who were cooperating with

        16    DCF, and you'll find in the findings there that there was

        17    pushback.

        18              There was argument last week at the hearing that the

        19    foster parents supported this, but then we get the judge's

03:13   20    findings after our hearing before the Juvenile Court last week,

        21    and she indicates that initially they were hostile to the idea,

        22    and "hostile" was the word that they used.  I wouldn't.

        23    Because they felt it was moving too quickly and contrary to the

        24    child's best interest.

03:14   25              And of course there's the fact that the GAL request

1    that the attorney did make was denied.  So I would offer that

2    information.

3            THE COURT:  In the Juvenile Court?

4            MS. ZWICKER:  Correct, for more context.

03:14  5            THE COURT:  Okay.  So let's go ahead.

6            MR. CASEY:  Your Honor, should I address the GAL

7    issue?

8            THE COURT:  Sure.

9            MR. CASEY:  As you know, our motion from yesterday is

03:14 10    to respectfully ask the Court to reconsider its order from

11    September 19th insofar as it directs the appointment of a GAL.

12    The order, when entered on September 19th, was completely

13    appropriate and prudent.  The Court understandably was

14    concerned about making sure that the child's interests are

03:15 15    represented and advocated for.

16            What -- and speaking for us, we have very serious

17    concerns in a case like this about whether the foster parents

18    can appropriately and adequately represent the interests of the

19    child where there appears to be a conflict between the

03:15 20    interests of the child and the wishes of the child expressed

21    through counsel in the Juvenile Court case and what the foster

22    parents have expressed.

23            THE COURT:  Help me understand that.  Help me

24    understand that conflict.  Why?

03:15 25            MR. CASEY:  Because foster parents would like -- the

```
 1    relief they are asking for is a permanent injunction.  They say
 2    not against the Juvenile Court order, but that relief can only
 3    make sense if it is essentially to stay, enjoin, stop, overrule
 4    the Juvenile Court's order, and to reconsider.  There was
 5    discussion about an evidentiary hearing here or the taking of
 6    evidence.  To what end, Your Honor?  Is this Court going to
 7    consider an alternative placement for the child?  That would be
 8    overruling, overriding the --
 9         THE COURT:  That certainly doesn't make sense in that
10    space that this Court is supposed to be in.
11         MR. CASEY:  So the GAL appointment made complete
12    sense.  Things were moving very fast.  Everyone -- the Court
13    commendably wanted to make sure the child's interests were
14    represented and advocated for in this Court.
15         The issue is that, as we have learned more about this
16    and as we have made the arguments that we have for why it's
17    inappropriate for this case to be in federal court, to
18    essentially in one way or another stay, review, enjoin,
19    reconsider the Juvenile Court's decision when the Juvenile
20    Court has sole and exclusive jurisdiction to decide the custody
21    of the child.  There is a serious risk, and you'll see in our
22    PI opposition that we argue a number of federal court
23    doctrines, like the domestic relations exception to federal
24    jurisdiction, *Younger* abstention, the *Rooker-Feldman* doctrine.
25         All of these doctrines stand for the proposition
```

1    together that it is inappropriate for federal courts and

2    federal courts lack jurisdiction to review and potentially undo

3    or modify what was done regarding -- certainly regarding child

4    custody in a state court that has that specialized purpose.  It

03:17  5    has not only a specialized purpose but specialized staff and a

6    specialized function.  It has, again, court-appointed attorneys

7    from CPCS, including one who represented the child throughout.

8    The Court appointed a Court investigator, which by statute

9    happens in essentially every care and protection case, who was

03:18 10    required to investigate the family circumstances and report

11    objectively to the Court about the situation.  And of course

12    the Court is required to make a determination based on the best

13    interest of the child.

14          So because all of that has already happened, the

03:18 15    child's interests have already been expressed, advocated for,

16    considered, and taken into consideration when the Court made

17    its decision to return custody to the father.  And there is a

18    risk that by appointing a GAL here, that will create new

19    material, new evidence that would put this Court in frankly an

03:18 20    untenable position of sitting in review of with new --

21    potentially new evidence and maybe a new report from a GAL

22    about --

23          THE COURT:  Not a new report because there was no

24    report, right?

03:19 25          MR. CASEY:  Well, there was --

               1          THE COURT:  You had the attorney --

               2          MR. CASEY:  -- new evidence.

               3          THE COURT:  Right, new evidence.  What is wrong with

               4    that?

03:19          5          MR. CASEY:  You have a home study.

               6          THE COURT:  What is wrong with the Court appointing a

               7    GAL to do what plaintiff says was not done?  That request was

               8    denied by the court.  And plaintiffs are not a party to the DCF

               9    action, the care and protection action, but at least for DCF to

03:19         10    inform the court that there's this GAL report that was created

              11    under the federal court's jurisdiction as the Court is trying

              12    to figure out whether this should be here or what should happen

              13    in the interim and DCF present that to Judge Phelan-Brown and

              14    Judge Phelan-Brown says, well, yep, maybe I should have

03:19         15    considered this or, you know, maybe I should have appointed one

              16    before rather than just accepting the representations by the

              17    attorney or not and bring, you know -- introducing new evidence

              18    basically.

              19          MR. CASEY:  Your Honor, again, everything --

03:20         20          THE COURT:  I'm not saying that's what I'm going to

              21    do, but I'm just throwing this out there.

              22          MR. CASEY:  It intertwines this Court with the

              23    proceedings and the decision of the Juvenile Court in a way

              24    that the decisions of the First Circuit and other district

03:20         25    courts in this circuit have said it's impermissible.

1           The Juvenile Court has made a decision, and it's made

2    a decision based on all the evidence that you have before you

3    now in the form of the --

4           THE COURT:  But how does the -- I apologize for

03:20  5    interrupting.  But how does the plaintiff -- and I'm referring

6    to counsel in particular -- how does she make the arguments in

7    that DCF action, that there are things that should have been

8    considered that weren't considered, and that the things that

9    were represented are not true?

03:20 10           MR. CASEY:  Your Honor, one way is for exactly what

11    happened here, which is for the foster father to testify.  The

12    foster father testified at the evidentiary hearing and offered

13    his testimony and his evidence regarding what he thought was in

14    the best interest of the child, where he thinks the child

03:21 15    should end up.

16           So this is not a situation -- yes, it's true, the

17    foster parents were not parties to this case, but they -- it is

18    always the case, the Juvenile Court would never make a decision

19    without -- if there are preadoptive parents, if there are

03:21 20    foster parents who are waiting in the wings to adopt a child,

21    they would always hear from those foster parents.

22           THE COURT:  I'm encouraged to hear that, particularly

23    a family who's invested so much time, effort in bringing this

24    child along to where the child appears to be doing better, and

03:21 25    you know, giving them a say in it.  So I'm happy to learn that.

Go ahead.  And they should be commended for, you know, taking

on a child that is not their biological child and interested

and committed to the adoption should that be possible, but it

may not be possible.

03:22   MR. CASEY:  And, Your Honor, so there is this --

THE COURT:  Not enough kids have people like them in

their lives.

MR. CASEY:  Your Honor, I've handled a number of

termination cases, and they're often very, very sad stories.

03:22   And so this is not a sad story, I will say.  It is very rare --

talking about commending parents, it is very rare for a

biological parent who has been deemed unfit to make the efforts

that this biological father has to demonstrate his fitness, and

to take -- you know, even coming back to this country, doing

03:22   all the things that was asked of him by DCF to demonstrate that

he could be a fit parent.

So this is I think a happy story compared to many of

the frankly very sad stories that come out of DCF cases.

THE COURT:  They're very complicated and very

03:23   emotional cases.

MR. CASEY:  Absolutely, absolutely.

THE COURT:  And that's one of the reasons why I

stopped practicing in that area and moved on.

MR. CASEY:  It's very hard, and there are a lot of sad

03:23   stories.

1          So all of that has played out where it was supposed to

2    play out.  It played out in the way it was supposed to play

3    out.  It played out in the Juvenile Court over four years with

4    DCF changing the goal from adoption to reunification over a

03:23 5    year ago.  Once it saw the strides that the father had made,

6    the judge received a motion with evidence and heard testimony

7    from the foster father, and considered all of the evidence and

8    made a decision with findings explaining why father is fit and

9    custody should be returned to him.

03:24 10          There is, in our view, an unacceptable risk that if a

11    GAL is appointed here, and again, submits new evidence, new

12    material, that this Court is going to be, first of all, sitting

13    in review of what the Juvenile Court did, which is the whole --

14    the very thing that *Rooker-Feldman* and the domestic relations

03:24 15    exception are intended to avoid.

16          THE COURT:  I'm not sure that the GAL decision is

17    doing that.  The overall case maybe, but I'm not sure about the

18    GAL aspect.

19          MR. CASEY:  Well, Your Honor, hypothetically, and I'm

03:24 20    not saying I would expect this, but hypothetically, if the GAL

21    has a very different opinion than counsel for the child, then

22    it puts this Court in a very difficult and I would suggest

23    untenable situation where you are saying wait, this is

24    something different from what the Juvenile Court did.  I've got

03:25 25    this new evidence.  Can I -- should I be reaching a different

1  result.  Should I be modifying the Juvenile Court's order.

2  Those are the very things that all these doctrines are intended

3  to stop, to prevent.

4       And the cases also talk about how juvenile courts have

03:25  5  these specialized staff, these specialized functions, GALs,

6  court reporters, specialized attorneys who are trained to

7  represent children and parents.  They -- day in, day out they

8  take these steps to make sure the child is adequately

9  represented.  Their views are advocated for and expressed, and

03:25 10  the Juvenile Court has all the facts and circumstances it needs

11  in order to make a decision, the ultimate decision about the

12  child's best interest, which here, the Juvenile Court

13  determined was to return the child to the biological father.

14       So we think this creates kind of an unacceptable risk

03:26 15  of injecting new evidence, kind of enmeshing the Court in

16  review of the Juvenile Court's decision.  I also will say it

17  will undoubtedly, unavoidably inject delay in this case.  Both

18  the case law from the Supreme Court, from our Supreme Judicial

19  Court and Appeals Court that say the child is entitled to

03:26 20  permanence, and they are entitled to a decision on custody as

21  rapidly as possible consistent with fairness.  And so this

22  is -- and the Juvenile Court recognized that.  It said, you

23  should return custody of the child to father without delay,

24  create an immediate plan, create a travel plan that has her

03:26 25  flying to Guatemala as soon as practicable.

1          So there's the delay that could be created by

2     appointment of a GAL, and you know, waiting for that process to

3     play out is kind of inconsistent with the child's and the

4     biological father's right to permanence and to prompt

03:27 5     disposition of their case.

6          THE COURT:  So I want to just say, you're doing a

7     great job, and you're very forceful in your presentation on

8     behalf of the parent.  I just don't know about what you're

9     asking.  So you say it's not about the order, that if the

03:27 10    father was here, the father would be able to take the child

11    with him.  We know that he can't come here.

12          MS. ZWICKER:  Right.

13          THE COURT:  And we -- I understand that your

14    clients -- well, your client is the child but through the next

03:28 15    of friend, the foster parents, that you're representing, what

16    you're sort of creating is this argument, theory that they

17    can't take this U.S. citizen and put her on a flight to go to

18    live with her father.

19          MS. ZWICKER:  Correct.

03:28 20          THE COURT:  And she's not losing her citizenship by

21    making such a move.

22          MS. ZWICKER:  I think -- I understand what counsel is

23    saying today, and I think all those cases they point to have

24    nothing to do with this case.  They want to gravitate this case

03:28 25    back to how fit father was, how fit he was found to be by the

1    Court, and this is a custodial issue.  It truly is not.  It's a

2    constitutional --

3         THE COURT:  But you did in your papers talk about all

4    the ways in which you didn't think he was fit, because of the

03:29 5    two interactions with, you know, the OUI and the car accident.

6    You also talked about the very limited Zoom hearings, that his

7    speaking Spanish only and the child only speaking English, and

8    how upset the child was with the overnight visit or these

9    unsupervised visits.  So you did put those things in the

03:29 10    complaint.

11         MS. ZWICKER:  Absolutely.  We wanted to give the Court

12    context to talk about --

13         THE COURT:  So that's how I receive the information

14    that they have provided, that he's done all of these things,

03:29 15    that he's -- he came back to the U.S., he took the English as a

16    second language course, the parenting classes, that he's made a

17    home for this child in Guatemala.

18         MS. ZWICKER:  Understood, Judge.  But again, going

19    back to the two issues that we have, we have the issue of a

03:29 20    state agency under the color of their authority removing her.

21    They have to find a different way.  They're before this Court

22    now and they don't know there's another way for father to come

23    here legally and obtain custody of the child.

24         And then there is this large issue.  The only thing

03:30 25    this child advocated for through her counsel was a guardian ad

1    litem and that was denied.  And in the eight-page finding of

2    the Court, nothing about her wishes.  So that goes to the

3    second part of what our argument here is, that her due process

4    rights were trampled on here.

03:30   5        And she's not just being asked to go from

6    Massachusetts to New Hampshire.  She's asked to go to another

7    country where she has to be naturalized.  And how is she going

8    to become a citizen when she's there?  Are there going to be

9    any immigration issues for her when she arrives there?

03:30   10        These are part of her rights that are being enjoined

11   here by DCF now sticking their hand in this and bringing her

12   internationally.  And again, big picture, I understand this is

13   not a one-time thing that happened on this case.  It's not an

14   unusual thing.  This is something that they will do on a

03:30   15   regular basis.  If a child cannot be picked up by a parent or a

16   legal guardian, they will bring the child to another country

17   and leave them there.  And ironically, it goes against the

18   bounds of their own oversight.  When they transition a child to

19   a parent for permanent custody, they refer to that in their own

03:30   20   document as the most tenable time in a child's life because,

21   like an organ transplant, you'll either succeed or fail.  But

22   they have no ability now for follow-up once they do that.

23        Again, so it goes back to the young girl's rights, her

24   due process rights to be heard effectively in the underlying

03:31   25   case before an important decision is made.  I don't think a GAL

1    appointed here will have any -- in fact, they are not going to

2    get into the parental fitness and get into the home study.

3    They are going to look at the constitutional issue here and see

4    whether or not her rights were adequately protected.

03:31  5         THE COURT:  What does a GAL have to say on

6    constitutional rights?  I mean, what expertise would that

7    attorney have on constitutional rights?  That's why you are

8    here.

9         MS. ZWICKER:  Understood, understood.  But they can

03:31 10   look at the inflections of whether or not she understands

11   permissibly now that she is going to be leaving the United

12   States for an indefinite period of time and not coming back, if

13   this child adequately understood.  Because part of what

14   presumably the judge based it on was a representation from

03:31 15   counsel that this was her expressed wish because this is what

16   counsel is arguing throughout their pleadings, that this was

17   her expressed wish through her attorney.

18        And, you know, sometimes we don't get it right, Judge.

19   Sometimes lawyers get it wrong.  And this is why we loaded up

03:32 20   our pleadings with the instances of the child being resisting

21   having these visits, she'd act out having these visits, because

22   that wasn't the case, that wasn't her expressed wish.

23        And one thing, again, the child advocated for through

24   counsel was denied by the Court, which is why that part of it

03:32 25   is equally important as our argument that DCF has no business,

1      it has no business packing up citizen children and transporting

2      them internationally.  That's the federal government's lane.

3      It's not their lane.  It's a slippery slope to have them keep

4      doing that, Judge, on an extended basis, which is why -- and we

03:32  5      think that's supported by the case law here in looking at

6      Perkins and --

7              THE COURT:  I think -- I apologize for interrupting.

8      I think what you're asking is for me to appoint a GAL to

9      communicate with the child and to make sure that that is

03:32  10     considered by the Juvenile Court, and so whether it is me or

11     some other court, requiring the Juvenile Court to consider

12     evidence.

13             MS. ZWICKER:  No, I would not be asking that.  I would

14     be asking that the guardian ad litem in this case to

03:33  15     investigate first and foremost whether or not the child has an

16     appreciable understanding that she is going to be leaving the

17     United States indefinitely and not coming back.  Because I will

18     tell you, she's talking about spending the holidays with my

19     clients.  So I would suggest that the evidence will show that

03:33  20     she did not, and that should factor into this Court's

21     determination as to whether or not a permanent injunction

22     should occur, whether or not her due process rights were

23     violated, and again, it's the other question, whether DCF even

24     has the legal authority to transport citizens internationally.

03:33  25     Because all the cases point to that actually happening because

1    the child is accompanying their parent.

2           THE COURT:  All right.  So I assume that there is no

3    other case like this.

4           MS. ZWICKER:  Correct.

03:33  5    THE COURT:  Why does that keep happening?  This Court

6    happens to deal with the first time ever these particular

7    issues, and I guess it's great lawyers that bring them to the

8    Court and force us to do that.

9           Question about -- so the child is a U.S. citizen,

03:34 10   father is a Guatemalan citizen.  I forget what the mother was.

11   Was she also from Guatemala?

12          MS. ZWICKER:  U.S.

13          THE COURT:  U.S. citizen.

14          MS. ZWICKER:  15 at the time she had her.

03:34 15   THE COURT:  I know, I know.  So the child -- I don't

16   know what's required, if a visa at all is required to travel to

17   Guatemala, but the child gets to Guatemala, the father is

18   there, to be united with the father, to live there, but will

19   she be a Guatemalan citizen, and what happens?

03:34 20          MR. CASEY:  Well --

21          THE COURT:  I don't know what their laws are with

22   regards to immigration.

23          MR. CASEY:  I can speak to her U.S. citizenship, which

24   is that she will keep her U.S. citizenship --

03:35 25          THE COURT:  I read that part.

              1          MR. CASEY:  -- unless and until she is an adult and

              2    renounces her U.S. citizenship.  So I can't speak to whether

              3    the father plans to secure dual citizenship for her.  I don't

              4    know the answer to that.  But she will not lose her citizenship

    03:35     5    by virtue of being in Guatemala.

              6          THE COURT:  But do we know if she can remain there

              7    lawfully?

              8          MR. CASEY:  Yes, I believe that she can as the child

              9    of a Guatemalan citizen and as a child of someone who was born

    03:35    10    there.

             11          THE COURT:  I'm not sure that would be true here.  So

             12    I don't necessarily assume that to be true there.

             13          MR. CASEY:  Right.  We can certainly look into that

             14    more, Your Honor.  I am very confident that she will both keep

    03:35    15    her U.S. citizenship and be allowed to remain in Guatemala.

             16    And she can make a choice when she is an adult about whether

             17    she wants to retain her U.S. citizenship or whether she wants

             18    to renounce it.

             19          THE COURT:  It sounds like she wants to come back for

    03:36    20    a visit for the holidays for sure.  Go ahead.

             21          MS. ZWICKER:  I know we haven't discussed names, but I

             22    did indicate to the clerk yesterday in terms of the guardian ad

             23    litem.  We did go through the list, and there is one name in

             24    common.  I noticed that counsel had proposed a Phyllis Warren

    03:36    25    be appointed.  She is an attorney for the Department of

1    Children and Family, so I will not endorse her.  And the other

2    party that they had recommended was Roberta Weiss.  She is

3    currently the director of ethics at Novartis, a biotech

4    company.  She hasn't done GAL work since 2011.

03:36    5        But who we did have in common was Attorney Laura Joyce

6    who is on the short list, has some immigration background.  Her

7    father was a judge apparently in the immigration court as well.

8    And I would also offer to the floor, attorney -- not attorney,

9    licensed mental health worker Patricia Brady.  She has an

03:37   10    extensive background in both care and protection and family

11    court cases and has acted as a guardian ad litem for many,

12    many, many years.  I think about 30 or 40 years.  So the two I

13    would endorse --

14        THE COURT:  And that's on the -- Patricia Brady is the

03:37   15    name?

16        MS. ZWICKER:  Yes, Patricia Brady and Laura Joyce are

17    of the two from the list provided by the Court yesterday.

18        THE COURT:  And that I believe was a list provided by

19    the Juvenile Court, their GAL list.

03:37   20        MS. ZWICKER:  Suffolk County, yes.

21        THE COURT:  Suffolk County.  And it had a telephone

22    number should I reach that point.  I haven't decided if I am.

23        Now, you did file opposition to their motion for

24    reconsideration, right?

03:37   25        MS. ZWICKER:  Yes.

          1              THE COURT:  So is there anything additional on that

          2     motion that a party needs to file?

          3              MS. ZWICKER:  Needs to file?

          4              THE COURT:  Yes.

 03:37    5              MS. ZWICKER:  No.

          6              THE COURT:  So that one is fully briefed.

          7              MS. ZWICKER:  Yes.

          8              THE COURT:  It is the motion for a TRO that is not

          9     fully briefed, but really a PI because DCF has agreed to not

 03:38   10     move this child, so there's no need for a TRO, correct?

         11              MR. CASEY:  Correct.

         12              THE COURT:  All right.  Now, if you want that in

         13     writing, you can get that in writing and file it with the

         14     Court.

 03:38   15              MR. CASEY:  Your Honor, she has it in writing.  I've

         16     made that representation in writing.

         17              MS. ZWICKER:  We're satisfied they are not going to do

         18     anything while the case is pending, Judge.  Thank you.

         19              THE COURT:  All right.  And so I need to deal -- well,

 03:38   20     do you -- and I don't -- I did review your papers, but I'm not

         21     sure how much -- and I realize you had a short period of time.

         22     If you -- how much you dealt with the three legal doctrines in

         23     it, the domestic relations exception, the *Rooker-Feldman* and

         24     *Younger* abstention.

 03:38   25              MS. ZWICKER:  We will deal with that in the reply

```
        1   brief, Judge.

        2           THE COURT:  Okay.  All right.

        3           MS. ZWICKER:  Which I think you've indicated you'll

        4   give us to Monday.

03:38   5           THE COURT:  I'll give you to whenever you need because

        6   they're not moving the child.

        7           MS. ZWICKER:  Okay.

        8           THE COURT:  All right.  So then, that's what I have to

        9   keep in mind, that I've got to look at those papers, all right?

03:39  10   Aside from the papers, is there reason to hold argument on the

       11   PI or can I decide it on the papers?

       12           MS. ZWICKER:  I think it depends if the Court chooses

       13   to appoint a GAL, and the more information we glean from that,

       14   would it require testimony or would it simply require

03:39  15   submission of the report and hearing argument about the report.

       16           THE COURT:  That's what I'm going to deal with first

       17   is the GAL, and then the parties can file something and say

       18   that oral argument is requested or it can be decided on the

       19   papers.  But the -- I certainly want to hear all of your

03:39  20   arguments, whether they're in writing or otherwise.

       21           MR. CASEY:  Your Honor, just to close one loop on the

       22   GAL issue, it sounds like we're in agreement, obviously we're

       23   asking the Court not to appoint a GAL.

       24           THE COURT:  Understood.

03:39  25           MR. CASEY:  But if the Court denies that motion and
```

1    elects to appoint a GAL, it sounds like we're in agreement of

2    one person.  So if the Court is agreeable to that person --

3            THE COURT:  And what I may do is, if I decide that it

4    is appropriate, is to have the parties consult with each other

03:40  5    and hopefully agree on what the ask is of the GAL.  And I know

6    that if I do allow it, that's over your objection, and so it

7    would be -- you would not willingly be identifying the ask, but

8    it's certainly better to have you involved in that process

9    rather than me inartfully issuing an order.

03:40 10            MR. CASEY:  Your Honor, if I could, I don't mean to

11    predict that we won't reach agreement, but if the Court elects

12    to appoint a GAL or to deny our motion, any guidance the Court

13    could provide about the questions you would like the GAL to

14    answer that would be of assistance to you I think would be

03:41 15    welcomed by the parties.

16            THE COURT:  I'm still trying to figure out why I need

17    that assistance, and so, you know, and what the real issues are

18    here that I have to resolve.  So I'm still grappling with that.

19    So -- and maybe that's worth another, you know, whether the

03:41 20    parties consult and file something or whether we have another

21    status conference on fine-tuning that.

22            It certainly was a rush and not something that this

23    Court does, which is why we had to reach out to the Juvenile

24    Court and so much confusion.

03:41 25            MS. ZWICKER:  If we may, Judge, I know there was a bit

of lecture, kind of find our way with that, I would like to

make that part of our briefing on Monday, the GAL piece of it.

I know we quickly responded to the opposition to that, that

turned around very quickly.  We learned of counsel's intention

03:42  and he filed his opposition and request for consideration and

we filed ours quickly in the afternoon.  But I would like to --

I think we have -- we're limited to five pages, but we asked to

expand it to ten.

THE COURT:  That's fine.  It's so important that it's

03:42  fine.  That -- and everyone was under a tight schedule, so to

the extent that there's any additional briefing that needs to

be done, I allow both sides to do so.

MS. ZWICKER:  Thank you.

THE COURT:  And when did you want until?

03:42  MS. ZWICKER:  If we're going to have it to -- beyond

Monday?

MR. DENNINGTON:  Sure.

THE COURT:  I mean, to be -- let me just look at my

calendar.  So I'm going to be starting a trial that's going to

03:42  take me through the end of October, so I really think I'll be

hard-pressed to do anything in October.  So that gives you

something to work with.  So to the extent that you need time,

don't feel like you need to do it by Friday or whatever it is.

And someone explain to the father what's going on, and

03:43  you know, whoever's responsibility that is, that I'm dealing

        1   with some first-time legal issues that I've got to sort

        2   through.

        3           MS. ZWICKER:  Would you like to give us a date?  Would

        4   you like to pick a date while we're here, Judge?  Does it

03:43   5   matter?

        6           THE COURT:  No, no.  I think -- you mean as far as

        7   briefing?

        8           MS. ZWICKER:  Briefing.

        9           THE COURT:  Yeah, yeah, you can do that.

03:43  10           MS. ZWICKER:  Friday, October 24th.

       11           MR. CASEY:  Your Honor --

       12           THE COURT:  I wasn't thinking that far.

       13           MR. CASEY:  Forgive me.  Time is of the essence here.

       14           THE COURT:  I get it.

03:43  15           MR. CASEY:  Constitutional rights are at stake.

       16           THE COURT:  That's her argument.

       17           MR. CASEY:  I emphatically do not want to jam the

       18   Court up.  We were prepared to go forward on the PSA.

       19           THE COURT:  I get it.

03:43  20           MR. CASEY:  We think this can and should be decided

       21   straightforwardly because the Court lacks jurisdiction.

       22   Waiting until the end of October, with them being able to take

       23   another month for a reply brief to reply to something we --

       24           THE COURT:  I agree.  That's too long.  What I had

03:44  25   more in mind is, you know, a week or two because -- and I say

          1    two because the reality of me being able to resolve it before

          2    the end of October, it's not likely.  And so that's why I'm

          3    giving both parties an opportunity.  So whatever date that they

          4    get will be the same date for the defendants.

03:44     5            MS. ZWICKER:  Friday, October 10th, a week from this

          6    Friday.

          7            THE COURT:  Okay.

          8            MS. ZWICKER:  Thank you, Judge.

          9            THE COURT:  All right.  Counsel?

03:44    10            MR. CASEY:  That's fine, Your Honor.

         11            THE COURT:  All right.  So anything else that needs my

         12    immediate attention?

         13            So with regards to that portion of the order that says

         14    the appointment of GAL, that will just be stayed for the moment

03:44    15    until I resolve that issue, all right?

         16            MS. ZWICKER:  That's good.

         17            THE COURT:  Thank you for your time.

         18            MS. ZWICKER:  Thank you, Your Honor.

         19            MR. CASEY:  Thank you, Your Honor.

03:45    20            THE CLERK:  We're adjourned.

         21            (Adjourned at 3:45 p.m.)

         22

         23

         24

         25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3              I, Linda Walsh, Registered Professional Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter, to the best of my skill and ability.

9              Dated this 6th day of October, 2025.

10

11

12              /s/ Linda Walsh

13              Linda Walsh, RPR, CRR

14              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25